# Ex. 3, Court of Claims Order on Plaintiffs' Motion for Preliminary Injunction

**STATE OF MICHIGAN**

**COURT OF CLAIMS**

VIRIDIS LABORATORIES, LLC, and VIRIDIS NORTH, LLC,

Plaintiffs,

v

MICHIGAN MARIJUANA REGULATORY AGENCY, ANDREW BRISBO, JULIE KLUYTMAN, DESMOND MITCHELL, and CLAIRE PATTERSON,

Defendants.

______________________________/

**OPINION AND ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Case No. 21-000219-MB

Hon. Christopher M. Murray

Before the Court is plaintiffs' *ex parte* motion for preliminary injunction and temporary restraining order. On November 22, 2021, plaintiffs filed a ten count, 310 paragraph verified complaint, along with the aforementioned motion filed the next day. The Court issued a November 24, 2021 order setting forth a briefing schedule and setting December 1, 2021, as the date for any necessary hearing.[1] The parties have complied with the briefing schedule, an evidentiary hearing was held over the course of two days, and the motion is ripe for decision.[2]

---

[1] *Ex parte* relief was not granted because plaintiffs' counsel had communicated with defense counsel in the weeks leading up to the filing of the verified complaint, and the dispute appears to be business-related and not one involving immediate and irreparable harm that warranted no notice. MCR 3.310(B)(1)(a).

[2] Plaintiffs' motion to file a supplemental brief will be granted, as noted during the hearing.

# I. BACKGROUND

Plaintiffs are separate limited liability companies[3] licensed by defendant Michigan Marijuana Regulatory Agency (MRA) as safety compliance facilities to sample and test for, amongst other things, microbials and other foreign substances, in both adult-use and medical marijuana products, and apparently have a large share of that marketplace in Michigan. Separately, and prior to the events at issue, plaintiffs received accreditation from A2LA, a leading national accreditation organization for marijuana testing laboratories, for their methods and standard operating procedures The MRA has observed and tested plaintiffs' testing methods and approved them and their standard operating procedures in the past couple of years.The MRA has also performed testing proficiency evaluations of both entities' processes in 2021, and all testing was satisfactory.

According to the verified complaint, the dispute's early origins arose in November 2020, when the MRA first inquired about the "Viridis method" of potent testing. It was at that time that the MRA sought to prevent plaintiffs from using that method for potency analysis.[4] Fast forward to October of 2021, the MRA informed plaintiffs that it had received 15 complaints against plaintiffs and that those complaints would be investigated. The MRA conducted site investigations at both labs and sent the results of those investigations to plaintiffs on October 29, 2021.

The linchpin for the institution of these proceedings was the November 17, 2021, recall bulletin issued by the MRA. In that document, the MRA recalled all products tested by plaintiffs between August

---

[3] Veridis Laboratories LLC is located in Lansing, while Veridis North LLC is located in Bay City.

[4] Potency testing is not at issue, and on October 25, 2021, plaintiffs filed an administrative complaint against the MRA regarding the potency testing issue, which is set for a hearing before an administrative law judge on December 22, 2021. Defendants assert that plaintiffs intend to amend the administrative complaint at a conference to be held on December 7 to include challenges to the recall, but that has not yet occurred and was not confirmed by plaintiffs.

10 and November 16, 2021, except certain inhalable products. Plaintiffs claim the recall affects 64,000 pounds of "flowers" valued at retail prices at over $229 million.

With respect to why the recall was issued, the bulletin indicates that the MRA had "identified inaccurate and/or unreliable results of products tested by [plaintiffs]," and that all marijuana products tested by plaintiffs, except certain inhalable products, were recalled for the noted time period. There are no internal documents outlining the reasons for implementing the recall.[5] Though she was not a decision-maker, Claire Patterson, Manager of the Scientific and Legal Enforcement Division of the MRA, testified to her understanding that the recall was based upon an uncertainty that the labs were following the validated methods and/or there were deviations from those methods. Specifically, Ms. Patterson testified that she informed plaintiffs that the basis for the recall was the failed ten re-tested samples and the lack of an incubation log. Compliance with the recall requires that a licensee with the affected product either destroy it, have it re-tested for the microbial compliance panel, or have it sent back to the original licensee for it to do so.

As noted, plaintiffs' verified complaint contains ten[6] counts, specifically: Count I, alleging a preliminary and permanent injunction; Count II, alleging a writ of mandamus and motion for ex parte relief; Count III, seeking a declaratory judgment that the microbial rule and log rule are procedurally and substantively invalid; Count IV, seeking a declaratory judgment that the MRA lacks authority to summarily restrict marijuana business licenses; Count V, alleging a violation of the state and federal due process clauses; Count VI, alleging a violation of plaintiffs' "substantive due process" rights under the state and federal constitutions; Count VII, alleging a violation of the state and federal equal protection

[5] It is curious that no document was created by the MRA setting out the reasons for the recall, which seems to have in part led to some confusion between the parties in the immediate aftermath of the recall.

[6] The verified complaint indicated eleven counts, but the numbering skipped over a Count 9.

clauses; Count VIII, alleging tortious interference with business relationships, expectancies and contracts; Count X, alleging abuse of process, and Count XI, alleging civil conspiracy.

On the 13th page of their brief in support of the motion, and at the start of their argument, plaintiffs focus their challenge on the recall bulletin to the extent it (1) recalls products tested by Viridis North, and (2) recalls marijuana products that plaintiffs did not analyze for aspergillus or other microbials. The legal basis for these challenges is the administrative procedures act, MCL 24.201 *et seq*., and the procedural and substantive due process clauses of the state and federal constitutions.[7]

## II. ANALYSIS

As noted, plaintiffs seek the extraordinary remedy of a preliminary injunction. The ultimate purpose of a preliminary injunction is to preserve the status quo that existed prior to the challenged action to allow the judiciary an opportunity to peacefully resolve the dispute. *Buck v Thomas Cooley Law School*, 272 Mich App 93, 98 n 4; 725 NW2d 485 (2006) (the Court defined the status quo as " 'the last actual, peaceable, noncontested status which preceded the pending controversy.' "), quoting *Psychological Servs of Bloomfield, Inc v Blue Cross & Blue Shield of Mich*, 144 Mich App 182, 185; 375 NW2d 382 (1985).

In *Slis v State of Michigan*, 332 Mich App 312, 336-337; 956 NW2d 569 (2020), the Court of Appeals outlined the four factors a court must consider in determining whether a preliminary injunction should be entered:

> Four factors must be taken into consideration by a court when determining if it should grant the extraordinary remedy of a preliminary injunction to an applicant: (1) whether the applicant has demonstrated that irreparable harm will occur without the issuance of an injunction; (2) whether the applicant is likely to prevail on the merits; (3) whether the harm to the applicant absent an injunction outweighs the harm an injunction would cause to the

[7] Plaintiffs' motion also states that it continues to assert that the entire recall was invalid based on what is contained in their verified complaint, but the motion and supporting brief focus mostly on these two aspects of the recall.

> adverse party; and (4) whether the public interest will be harmed if a preliminary injunction is issued.

The party requesting "injunctive relief has the burden of establishing that a preliminary injunction should be issued . . . ." MCR 3.310(A)(4). "An injunction represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Senior Accountants, Analysts & Appraisers Ass'n v Detroit*, 218 Mich App 263, 269; 553 NW2d 679 (1996). Accord: *Davis v City of Detroit Fin Review Team*, 296 Mich App 568, 612; 821 NW2d 896 (2012).

Relative to the request for injunctive relief, the actual harm that plaintiffs could suffer in the absence of injunctive relief is exclusively related to the recall of products. There is no dispute that plaintiffs are currently allowed to fully engage in their business operations, and the MRA communicated that fact to plaintiffs on November 24th and 25th, 2021. This was one week from the issuance of the recall, and plaintiffs are unconstrained to continue testing in all aspects. The Court will therefore focus its attention on the recall.

A. LIKELIHOOD OF SUCCESS ON THE MERITS

As noted, for purposes of this motion, plaintiffs focus their challenge to the recall bulletin on the assertion that the bulletin was issued in violation of the APA and the procedural and substantive due process protections of the state and federal due process clauses.[8] The Court will first turn to the arguments

[8] "The Fourteenth Amendment to the United States Constitution and Const 1963, art 1, § 17 guarantee that no state shall deprive any person of 'life, liberty or property, without due process of law.' " *People v Sierb*, 456 Mich 519, 522; 581 NW2d 219 (1998). Although textually only providing procedural protections, the courts have grafted a substantive component to the Due Process Clause, see *In re Forfeiture of 2000 GMC Denali & Contents*, 316 Mich App 562, 573; 892 NW2d 388 (2016), that protects individual liberty and property interests from arbitrary government actions. *Cummins v Robinson Twp*, 283 Mich App 677, 700-701; 770 NW2d 421 (2009). To be protected by the Due Process Clause, a property interest must be a vested right, *Detroit v Walker*, 445 Mich 682, 698-699; 520 NW2d 135 (1994),

that defendants have violated their own rules, and that those rules violate the APA, for if plaintiffs appear to be correct on these points, there will be no current need to address the constitutional issues.[9]

Plaintiffs argue that the issuance of the recall bulletin violated defendants' own administrative rules, the APA, and was a de facto summary suspension/restriction of their licenses. The MRA, as an administrative agency, is required to comply with the requirements of the APA, MCL 333.27302, including when "denying, revoking, suspending, or restricting a license or imposing a fine." MCL 333.27407(2). The fundamental purpose of the APA requirements is to ensure public participation in an agencies rule-making process, which also helps keep the agency within the confines of the power granted it by the legislature. See *Michigan Charitable Gaming Ass'n v Michigan*, 310 Mich App 584, 607; 873 NW2d 827 (2015) ("This interpretation hardly seems compatible with the APA's goals of promoting public participation, preventing precipitous action, and preventing the adoption of rules that are illegal or beyond the intent of the Legislature," citing *Mich State AFL-CIO v Secretary of State*, 230 Mich App 1, 21; 583 NW2d 701 (1998)).

The MRA has the power to recall marijuana products from administrative rules. Specifically, R 420.502(2) provides that,

> to ensure access to safe sources of marihuana products, the agency, *if alerted in the statewide monitoring system*, may place an administrative hold on marihuana products,

---

which is "an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice." *Walker*, 445 Mich at 699.

[9] The Court rejects defendants' standing argument. Plaintiffs unquestionably have standing to *come into court* and challenge a recall that is directed exclusively at them. This sets them apart from the general public, and defendants' argument that allowing standing in this circumstance would undermine the health and safety concerns of the state conflates standing to sue with success in doing so. Nor does the existence of administrative procedures for certain challenges foreclose *a request* for injunctive relief.

> *recall marihuana products*, issue safety warnings, and require a marihuana business to provide information material or notifications to a marihuana customer at the point of sale.

This administrative rule is premised upon the statutory obligation placed upon the MRA to protect the public and ensure the integrity of the newly created marijuana market. MCL 333.27302(g) & (h) provide:

> (g) Providing oversight of a marihuana facility through the board's inspectors, agents, and auditors and through the state police or attorney general for the purpose of certifying the revenue, receiving complaints from the public, or conducting investigations into the operation of the marihuana facility as the board considers necessary and proper to ensure compliance with this act and rules and to protect and promote the overall safety, security, and integrity of the operation of a marihuana facility.
>
> (h) Providing oversight of marihuana facilities to ensure that marihuana-infused products meet health and safety standards that protect the public to a degree comparable to state and federal standards applicable to similar food and drugs.

With respect to plaintiffs' arguments that the MRA did not follow the administrative rules governing summary suspensions, the Court concludes–based on the current record–that no summary suspension occurred, and thus any argument that the MRA had to comply with administrative rules governing such suspensions is not well-taken. There is no doubt that the MRA issued no summary suspension of plaintiffs' licenses, a fact plaintiffs actually complain about (because at least the suspension would have invoked procedural rules), and a recall is a different action than a summary suspension, both of which are mentioned in the rules. As to the asserted de facto suspension or restriction that occurred following the issuance of the recall bulletin, that is not properly the subject of injunctive relief because it is undisputed that plaintiffs were notified by November 24/25–basically a week after the recall–that they were able to fully resume testing functions, and they are currently doing so. Injunctive relief for anything that caused plaintiffs to temporarily cease operations after issuance of the recall would be ineffectual.

Plaintiffs next argue that defendants have arbitrarily, and not in conformance with the APA, created new rules for the recall of marijuana products. This argument seems to have two parts to it. First, plaintiffs argue that R 420.505(2) contains no standards for determining when to issue a recall, and thus

the issuance of one under these circumstances in effect creates new rules not promulgated under the APA. Second, plaintiffs argue these "rules" are arbitrary since they allowed the inclusion of Viridis North within the recall, despite no products from that lab being re-tested.

With respect to the first argument, the Court concludes that the issuance of a recall under these circumstances was not the adoption of new administrative rules governing recalls. Instead, it was merely a decision to issue a recall based upon its power to do so and the existing circumstances. It may be that this decision was in part arbitrary, which will be discussed shortly, but the decision itself was not, in essence, the adoption of a rule and plaintiffs have provided no authority providing that such a decision can be considered to be so. Consequently, much of plaintiffs' arguments about the failure to comply with the APA are not on point.

Nevertheless, the absence of any standards governing when to issue a recall, the lack of any formal document explaining why the recall was issued, and the absence of any re-testing of marijuana products from Viridis North are other matters.

Looking first to the lack of any published or even internal standards[10] for determining when a recall should issue, it is clear that the MRA—pursuant to regulations, see R 420.305(10)—has published to labs the levels to be tested for, and what levels exceed acceptable levels. Dr. Michele Glinn testified to receiving these documents. Hence, there are published guideposts for what are, and are not, acceptable levels of microbials and foreign substances in the plants. But accepting the proposition that not every failure to accurately catch an unacceptable level of foreign substance would result in a recall, what level would? It is unclear. But no law has been provided that requires an administrative agency to promulgate

[10] Ms. Patterson testified that there are no internal documents outlining when a recall should be issued.

rules to that level of specificity in order to properly act. In other words, the MRA does have a valid rule allowing for a recall-based on alerts from the statewide monitory system-in order to protect the public health, and that authority may alone be legally sufficient to support a recall. Particularly so when, as most seem to have conceded during the hearing, the determination for a recall is so dependent on the unique circumstances being addressed by the agency.

In any event, defendants' answer seems to be that *in this case* a 60% failure rate on re-testing is enough, and the Court must defer to the agencies expertise in the area, particularly when the re-testing was for aspergillus, which according to Ms. Patterson, has the potential to be harmful to certain consumers.

However, the re-testing relied upon by the MRA in issuing the recall was *solely* product tested at Viridis. There is no dispute about that. No product tested at Viridis North was ever re-tested before the issuance of the recall to determine whether there were any failures in that lab's testing. Yet, the recall bulletin expressly states in the first sentence that the MRA "has identified inaccurate and/or unreliable *results* of *products tested by safety compliance facilities Viridis North, LLC* and Viridis Laboratories, LLC." As to Viridis North, that does not appear to be accurate, as everyone has agreed that no samples from Veridis North were included in the random samples re-tested prior to the recall, and which in part led to the recall.

It is no argument to say that the two entities have the same SOPs and methods (which, again, were approved by the MRA), for the entities are separate legal corporations, they do not share lab employees (who would be implementing the testing methods), and Viridis North has shown to accomplish things separately from Viridis (such as providing the incubator logs quicker than Viridis after the October investigations). But more importantly, the absence of any re-testing of products at Veridis North eliminates one of the two *factual bases* for issuing the recall, as stated in the bulletin and testified to by

Ms. Patterson. As for the other basis, it is undisputed that utilizing incubation time logs (1) was not required by statute or rule, (2) was not part of plaintiffs' SOPs that were approved this year by both the MRA and A2LA, and (3) as testified to by Ms. Patterson, temperature deviations did not impact aspergillus, which was the only foreign substance of concern in the recall. And, if incubator time logs were so imperative to a safe and accurate testing ability, presumably they would have been required before approval of the SOPs, but they were approved without the log requirement. Yet that is one of two bases for a large recall?

The Court is ever mindful of the rarity in which a preliminary injunction should issue in any matter, and in particular against a state agency given the power to act in the affected area. For example, in *M & S Inc v Attorney General*, 165 Mich App 301, 305; 418 NW2d 441 (1987), the Court used strong language discouraging court intervention in lawful and on-going administrative proceedings:

> While we are unwilling to conclude that the circuit courts should never intervene where an administrative agency summarily suspends a license pending a full administrative review, such intervention should be exercised with great caution. Where, as here, the administrative agency is taking action authorized by statute, it appears that the agency is complying with the applicable statute, there exist facts to support the agency's actions, and the due process rights of the individual involved are being observed, the circuit court should not intervene. Rather, the administrative proceeding should be allowed to run its course. Judicial intervention during the administrative process should be limited to those cases where the agency is riding roughshod over the individual, abusing it summary powers to protect the public interest.[11]

But the current situation is set in a different administrative context. For one, there is no current administrative process before the MRA related to the recall. The recall was announced, and is being overseen by the MRA, but there are no administrative proceedings underway. And, although the MRA

[11] See also, *Dep't of Homeland Sec v New York*, __ US __, __; 140 S Ct 599, 600-01; __ L Ed 2d __ (2020) (Gorsuch, J., concurring); *Trump v Hawaii*, __ US __, __; 138 S Ct 2392, 2424-29; 201 LEd2d 775 (2018) (Thomas, J., concurring).

has legal support to institute a recall, the factual support for the action is not present, at least for Veridis North.

And that fact leads to the case law holding that the absence of any factual basis for an agency decision constitutes arbitrary action, which is unlawful and subject to injunctive relief. See *Reed v Civil Service Comm*, 301 Mich 137, 152; 3 NW2d 41 (1942)("Injunction is the appropriate remedy to determine whether rights have been affected by the arbitrary or unreasonable action of an administrative agency. If the discretionary power of an administrative agency is abused or its judgment improperly exercised, the judiciary has the right to restrain the same."); *Sterling Secret Service, Inc v Michigan Dep't of State Police*, 20 Mich App 502, 509-510; 174 NW2d 298 (1969)(same), and *Wescott v Civil Serv Comm*, 298 Mich App 158, 162; 825 NW2d 674 (2012). Plaintiffs have shown a substantial likelihood of success with respect to its challenge to the MRA recall against Veridis North, but not Veridis.

B. IRREPARABLE HARM

It is generally true that economic losses do not constitute irreparable harm since damages can be recouped. See *Thermatool Corp v Borzym*, 227 Mich App 366, 377; 575 NW2d 334 (1998) ("Economic injuries are not irreparable because they can be remedied by damages at law. A relative deterioration of competitive position does not in itself suffice to establish irreparable injury."). But in *Slis*, the Court of Appeals also noted that

> the Court of Claims was correct that a 'loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp v Scott*, 973 F2d 507, 512 (CA 6, 1992). Whether "the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Apex Tool Group, LLC v Wessels*, 119 F Supp 3d 599, 610 (ED Mich, 2015) (quotation marks and citation omitted). [*Slis*, 332 Mich App at 362]

Here, the testimony of Greg Michaud and Craig Flocken were sufficient to establish irreparable harm if injunctive relief is not granted. Mr. Michaud testified to the significant economic consequences of the recall, as well as to threats of litigation, and customer complaints and demands, and other non-economic matters that are currently occurring to plaintiffs. Mr. Flocken, though indicating that he would in all likelihood remain a Viridis North customer, testified to the general sentiment and problems associated with the recall, as did Johnathon Kovack. Although many of these current problems could be associated with any recall, the testimony and common-sense tells one that a recall against two testing corporations for ineffective testing methods could cause lasting harm to goodwill amongst its customer base who are currently damaged by not getting product to market, and that cannot all be remedied by money damages. Indeed, Mr. Michaud testified to a legitimate concern of shuttering the doors to both labs within months should nothing change. Irreparable harm will occur in the absence of injunctive relief.

## C. HARM TO PLAINTIFFS VERSUS HARM TO THE MRA

This factor also weighs in favor of granting limited equitable relief. The Court's decision will prevent an arbitrary decision from continuing to cause irreparable harm to Veridis North, while at the same time enforces the respect due to the MRA's decisions that have any factual support, i.e., its decision as to Veridis.

## D. HARM TO THE PUBLIC INTEREST

Based on the evidence presented, this factor weighs about equally. On the one hand, the Court has concluded that the recall against Veridis North was in all likelihood based upon an arbitrary decision. And, there was persuasive evidence about the harm to plaintiffs, as well as to neutral customers who are subjected to the recall's impact. On the other hand, Ms. Patterson testified that the results so far of re-testing the recalled product has been 73% positive, 27% negative, which at first blush causes one to pause. But these test results are somewhat inconclusive. For one thing, what amount of the recalled products

have been tested, and are part of the aforementioned percentages, is unknown. Additionally, the negative percentages include samples found with aspergillus, yeast and mold, and chloroform, yet the only testing concern resulting in the recall was aspergillus, and how much of that substance was found in the re-testing is unknown.[12]

Public safety concerns are one of the main purposes and duties of the MRA, and undoubtedly it believes the recall of both Viridis and Viridis North was necessary to protect the public. As stated before, the Court defers to the agency with respect to its findings and conclusions as to the re-tested Viridis product. But when there is no evidence that Viridis North's testing also fit into that category, the safety concerns are reduced. Also consider the time-lapse between the MRA's receipt of the re-testing of the ten samples, and the issuance of the recall-a matter of roughly two weeks. Again, this factor weighs roughly equally regarding injunctive relief, with perhaps a slight tilt to granting limited relief.

## III. CONCLUSION

For these reasons, plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART. The November 17, 2021 recall as it pertains to Veridis North LLC is enjoined until further order of the Court. All other requests for relief are denied. The motion to file a supplemental brief is GRANTED.

Date: December 3, 2021

Christopher M. Murray
Judge, Court of Claims

---

[12] There was also testimony that in the autumn the levels of marijuana plants that fail because of aspergillus and yeast and mold is between 10-25%.